UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DAWN KOGUT,

                Plaintiff,

v.                                                      Case No.  5:04-cv-473-Oc-GRJ

JO ANNE BARNHART, Commissioner of
Social Security,

                Defendant.
_____/

## **ORDER**

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for a period of disability and disability insurance benefits (Doc. 1.) The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 14 & 17).  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g).

## **I. PROCEDURAL HISTORY**

On February 9, 2001, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging a disability onset date of December 31, 1998. (R. 57-59).   Plaintiff's application was denied initially and upon reconsideration. (R. 41-43, 45-46).   Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted Plaintiff's administrative hearing on February 5, 2003. (R. 367-91).   On February 7, 2003, Plaintiff filed her Petition To Amend Issues To Include

An Application For Supplemental Security Income Benefits (R. 19-20), which was denied on April 7, 2003. (R. 47.) The ALJ issued a decision unfavorable to Plaintiff on April 21, 2003. (R. 14-18). The Appeals Council denied Plaintiff's request for review (R. 3-7), making the April 21, 2003 hearing decision the final decision of the Commissioner. On October 25, 2004, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]  The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. SUMMARY OF THE RECORD EVIDENCE

At the time of the hearing, Plaintiff was thirty-seven years old. (R. 371.) She has a general equivalency degree (R. 92, 371)[22] and has previous work experience as a salesperson, construction flagger, assembler, and office manager. (R. 87). Because Plaintiff was insured for disability benefits through December 31, 1998, Plaintiff was required to establish disability on or prior to this date.

In his review of the record, the ALJ determined that Plaintiff had a history of a chronic pain syndrome, migraine headaches and irritable bowl syndrome. (R. 16.)

---

[18] Walker at 1003.

[19] Wolfe at 1077-78.

[20] *See id.*

[21] *See* Doughty at 1278 n.2.

[22] The records show that Plaintiff completed one year of college (R. 92), however, Plaintiff testified that she took only one course -- "Basic AC-DC and semi-conductors." (R. 371-72.) According to Plaintiff, this was not a "regular" college course. (Id.)

However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.  (*Id.*)  In reaching this conclusion, the ALJ considered Plaintiff's medical records from only October 15, 1998 through May 11, 1999.  The ALJ noted that "[a] great deal of the medical records are for the period of time between 1992 and 1997 during which time she does not allege a disability, but was treated for a chronic pain syndrome" and that the "remainder of the medical evidence is from the period of time well after [Plaintiff] last met the disability insured status requirements of Title II of the Act."

The ALJ then found that on or before December 31, 1998, Plaintiff retained the RFC to lift 20-30 pounds and sit, stand and walk without restriction.  (R. 17.)  Based on this RFC, the ALJ concluded that Plaintiff could perform her past relevant work as cashier, construction flagger, office manager, and assembler.  Accordingly, the ALJ found that Plaintiff was not under a disability at any time on or before December 31, 1998.

The ALJ also noted that Plaintiff's petition to amend her claim to include an application for supplemental security income benefits was denied.  According to the ALJ, a Title II application can never represent a protective filing for Title XVI benefits.  Because Plaintiff was no longer insured for Title II benefits after December 31, 1998, an application filed for Title XVI benefits at that time would represent a claim for benefits during a different period of time.

Plaintiff was treated by Oregon Hunter, M.D. from October 21, 1992 until July 10, 1995 for neck and back pain and headaches.  (R. 122-44.)    In January 1993, Dr.

Hunter found that Plaintiff has a chronic pain syndrome with depression. (R. 135.) On July 8, 1993, Dr. Hunter found that Plaintiff had reached maximum medical improvement and released her to sedentary work status and gave her a rating of 7% impairment of the whole person. (R. 127-28.) On July 10, 1995, Dr. Hunter noted that Plaintiff had chronic pain syndrome that was "particularly bad in the neck" and aching of the hands. (R. 122.)

From July 22, 1993 until March 14, 1997, Plaintiff was also treated by Domingo Cerra, M.D. (R. 145-92.) During the course of treatment, Dr. Cerra noted that Plaintiff had difficulty concentrating, no energy, crying, headaches, no libido, nightmares, insomnia, passive suicidal ideation, waxing and waning pain, anxiety, shoulder and neck spasms, transitory mood disturbances, back pain and constricted affect. (R. 146-47, 149-51, 155-57, 160-62, 164, 169, 171, 174, 176, 180-83, 187, 190.)

From January 1997 through December 2000, Plaintiff was treated by Lucio Gordon, M.D., Artemio Marten, M.D., and James Wisdo, D.O. at Family Care Specialists. (R. 199-264.) On January 13, 1997, Plaintiff reported nausea, vomiting, diarrhea, and headache. (R. 242.) Over the next eight months, Plaintiff was diagnosed with carpel tunnel syndrome, migraine headaches, back spasm and fibromyalgia for which several medications were prescribed. (R. 237, 239, 241.) On January 5, 1998, Plaintiff reported neck and back pain with spasm, which were palpable upon examination and described as acute right periscapular and thoracic paraspinal muscle spasms. (R. 235.) On July 30, 1998, Plaintiff reported a migraine headache with nausea and photophobia. (R. 231.) In October 1998, Plaintiff reported occasional diarrhea and Dr. Wisdo's diagnoses included questionable Irritable Bowl Syndrome

("IBS"). (R. 228.) In January 1999, Plaintiff reported increased headaches and occasional diffuse aches and pains. (R. 227.) Dr. Wisdo noted that Plaintiff ambulated without assistance or difficulty. (*Id.*) On March 31, 1999, Plaintiff noted occasional headaches, but had no other complaints. (R. 225.) On May 11, 1999, Dr. Gordon saw Plaintiff for follow-up of her chronic pain syndrome/fibromyalgia; history of endometriosis, status-post partial hysterectomy; irritable bowl syndrome; chronic migraines; and back spasms. (R. 223.) Dr. Gordon recorded that Plaintiff's IBS was "currently stable" and that she "may have fibromyalgia" but that "she does not have all the criteria." (*Id.*) In August and October 1999, Dr. Gordon noted that Plaintiff needed to taper off of narcotic pain killers however he continued her medication because Plaintiff was not abusing it and it seemed to be helping her. (R. 208, 210, 215, 217, 219.) Plaintiff reported diarrhea in February 2000 (R. 210) and chronic pains, fatigue, decreased sleep efficiency, decreased energy and decreased ambition, anxiety spells, nervousness, sense of helplessness and intermittent problems with irritable bowel symptoms in April 2000. (R. 205.) On April 18, 2000, Dr. Gordon prescribed Zoloft for Plaintiff's chronic depression and ordered a thyroid function test for Plaintiff's fatigue. (Id.) Plaintiff's condition stabilized or improved until December 2000 when Plaintiff reported worsened IBS symptoms and a recent "flare-up" of fibromylagia pains. (R. 197.)

From May 2001 through January 2003, Plaintiff was treated by Emmeline Blankenbicker, M.D. (R. 329-33, 358-60, 362.) Dr. Blankenbicker diagnosed Plaintiff with fibromylagia, IBS, depression, anxiety, chest pain and bronchitis/URI. On February 11, 2002, Dr. Blankenbicker completed a work-related functional assessment. (R. 324-

28.)  Dr. Blankenbicker found that due to Plaintiff's fibromyalgia and IBS she could lift less than five pounds; stand/walk 2-3 hours in an 8-hour day and stand/walk for 30 minutes-1 hour without interruption; sit for a total of 1-2 hours in an 8-hour day and sit for 30 minutes-1 hour without interruption; and never climb, balance, stoop, crouch, kneel, or crawl.  (R. 324-25.)  Dr. Blankenbicker further found that Plaintiff's ability to reach, handle, feel, and push/pull were limited due to pain and that she would require rest periods every 1 to 2 hours for 30 minutes to an hour. (R. 326.)  Dr. Blankenbicker noted environmental restrictions of moving machinery, temperature extremes, chemicals, noise and humidity.  (R. 327.)  Finally, Dr. Blankenbicker reported that Plaintiff's medications may impair driving and judgment.  (R. 328.)

On September 20, 2002, Plaintiff again began treatment with Dr. Cerra.  (R. 343-56.)  Plaintiff reported depression, anxious mood, insomnia, low energy, anergia and anhedonia, difficulty concentrating, forgetfulness, some weight loss due to IBS, social isolation, erratic crying episodes, free-floating anxiety with sweating, tremors, motor tension, muscle contraction headaches, IBS, increased heart rate, shortness of breath, chest wall tightness, chronic cervical and low-back pain with intermittent radicular symptoms.  (R. 343.)  On examination, Plaintiff was tearful periodically with an anxious/depressed affect.  (R. 344.)  Dr. Cerra diagnosed Plaintiff with Dysthymia, Generalized Anxiety Disorder, Rule out Mood Disorder and a GAF of 60-51 and recommended supportive psychotherapy, Valium and a trial of Paxil. (R. 344-45.)

On a functional capacity assessment form dated November 28, 2002 (R. 346-51), Dr. Cerra opined that Plaintiff would be absent from work more than three days a month.  (R. 348.) Dr. Cerra explained that Plaintiff is incapable of gainful employment

due to chronic cervical and low back pain, chronic musculoskeletal spasms, severe diarrhea with blood, persistent mood, cognitive and behavioral problems. (R. 347.) Dr. Cerra noted that Plaintiff's mental abilities for unskilled work were "fair" to "poor" in almost all areas[23] and explained that "ongoing sleep problems paired with chronic musculoskeletal pain/spasms and GI problems produce anxiety and depressive symptomatology that impair her attention and information processing, control of her behavior (anger, crying) and ultimately her judgment." (R. 349.) Dr. Cerra found that Plaintiff had marked limitations in activities of daily living; marked difficulties in maintaining social functioning; frequent/constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and that she "[h]as been unable to work due to the above." (R. 350.) Dr. Cerra noted that Plaintiff "is to avoid prolonged standing, walking, lifting, bending and stooping . . . per Dr. Hunter and Blankenbicker." (R. 351.)

In December 2002 and January 2003, Dr. Cerra noted that Plaintiff had daily mild to moderate free-floating anxiety; low grade depression; erratic crying episodes; chronic cervical pain and moderate spasms of the posterior, cervical, trapezius, paraspinal, and lumbar muscles; chronic low back pain and intermittent L5-S1 radicular symptoms bilaterally; muscle contraction headaches; diarrhea with bright red blood ; difficulty concentrating; erratic wakings and nightmares, low energy, and tenderness over the sacroiliac joint. (R. 365-66.)

---

[23] Dr. Cerra noted that Plaintiff's ability to ask simple questions or request assistance was good. (R. 349.)

Two non-examining state agency physicians completed physical RFC assessment forms -- Donald Warren Morford, M.D. on May 21, 2001 (R. 280-87) and Eric C. Puestow, M.D. on October 9, 2001 (R. 302-09.)  Morford found that Plaintiff could perform light work activities, limited by her ability to occasionally climb, balance, stoop, kneel, crouch, or crawl, and by avoidance of exposure to temperature extremes. (R. 281-84.)  Puestow found that Plaitniff could perform unlimited medium work activities.  (R. 303-07.)

There are also two Psychiatric Review Technique forms of record -- Michael H. Zelenka, PhD on May 21, 2001 (R. 265-79) and Val J. Bee, Psy.D. on October 1, 2001 (R. 288-301.)  Based on their review of the medical records, Zelenka and Bee both found that  Plaintiff did not have a severe mental impairment in December 1998.

At the hearing on February 5, 2005, Plaintiff testified that she was unable to work because of constant pain in hands, arm, neck, lower back and legs and frequent bouts of diarrhea which doctors attribute to Irritable Bowl Syndrome and/or Crohn's Disease. (R. 376, 378-80.)  Plaintiff also testified that she has bad headaches about five to eight times per month and that she is depressed.  (R. 380, 382.)  Plaintiff testified that, when she is able, she cooks and cleans the house, and cares for her husband.  (R. 383-84.)

## IV. DISCUSSION

### A.   The ALJ Erred By Assuming That The Medical Evidence Post-Dating May 11, 1999 Was Not Relevant

The ALJ's discussion of the medical evidence was limited to Plaintiff's medical records from Family Care Specialists during the period of October 15, 1998 through May 11, 1999.  (R. 16.)  Plaintiff argues that the ALJ erred by failing to consider the bulk

11

of the medical evidence in the record -- i.e., evidence pre-dating October 15, 1998 and evidence post-dating May 11, 1999.

With respect to the earlier medical evidence, the ALJ noted that "a great deal of the medical records are from the period of time between 1992 and 1997, during which time [Plaintiff] does not allege a disability, but was treated for a chronic pain syndrome." (R.16.) Plaintiff argues that the ALJ erred by not finding that her work from June to October 1998 as a cell phone refurbisher constituted an unsuccessful work attempt.[24] However, this is ultimately irrelevant because, as the ALJ correctly noted, Plaintiff alleged that she was disabled as of December 31, 1998. (R. 57.) Accordingly, the ALJ was not required to consider the earlier medical records.

As for the later medical evidence, the ALJ explained that the "remainder of the medical evidence is from the period of time well after the claimant last met the disability insured status requirements of Title II of the Act." (R.16.) As Defendant acknowledges, post-coverage evidence is relevant to the extent that it sheds light on a claimant's condition while he or she was insured.[25] In assuming that the more recent medical records were not relevant, the ALJ failed to consider the opinions of Plaintiff's treating physicians -- i.e., Domingo Cerra, M.D., a psychiatrist, who treated her before and after December 31, 1998 and who completed a functional assessment documenting the severity of her mental impairments; Emmeline

---

[24] See Doc. 14, pages 15-18.

[25] See Doc. 17 at 9 (citing Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988); Martonik v. Heckler, 773 F.2d 236, 240-41 (8th Cir. 1985.))

Blankenbicker, M.D., who treated Plaintiff from May 2001 through January 2003 and who rendered an opinion regarding Plaintiff's functional limitations; and Dr. Gordon of Family Care Specialists who began treating Plaintiff in 1999.  The Eleventh Circuit has recognized that a treating physician's opinion is entitled to significant weight even though he or she did not treat the Plaintiff until after the relevant determination date.[26]  Accordingly, while the ALJ might ultimately determine that these medical records do not shed light on Plaintiff's condition while she was insured, it was error for him to assume that they were not relevant without articulating any reasons to support his conclusion that these records were irrelevant.[27]

### B.     The ALJ Erred As A Matter Of Law In Denying Plaintiff's Request To Amend Her Claim To Include An Application For Supplemental Security Income Benefits

 On February 7, 2003, Plaintiff made a written request to amend her claim to include an application for Supplemental Security Income Benefits.  (R. 19.)[28] Plaintiff represented that while her husband was gainfully employed at the time of the initial Title II application, he was no longer employed and they had no income

---

[26] See Boyd v. Heckler, 704 F.2d 1207, 1211 (11th Cir. 1983)(citing Dousewicz v. Harris, 646 F.2d 771, 774 (2nd Cir. 1981); Stark v. Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974.)

[27] Plaintiff also argues that the ALJ erred by failing to obtain the advice of a medical expert regarding the onset date of disability.  See Doc. 14, pages 10-13.  Plaintiff contends that Social Security Ruling ("SSR") 83-20 and the case law interpreting it, including this Court's opinion in McManus v. Barnhart Case No. 5:04-cv-67-Oc-GRJ (M.D. Fla. Dec. 14, 2004)(unpublished) required the ALJ to seek the advice of a medical expert. However, as discussed above, the ALJ erred by failing to consider medical evidence post-dating May 11, 1999.  Upon remand, the ALJ will have to determine after reviewing this additional medical evidence whether it is necessary to obtain the advice of a medical expert regarding the onset date of disability.

[28] Apparently, Plaintiff has filed a formal application for SSI benefits and that application is currently pending.  See Doc. 14, page 19 n.9.

at that time. Plaintiff further requested that "the Title II application be considered as an oral inquiry about SSI, and that the date of the Title II application [ ] be used to establish[] as the SSI application date."

In denying Plaintiff's petition, the ALJ incorrectly stated that a Title II application could never represent protective filing for Title XVI benefits. (R. 17.)[29] Under certain circumstances, a Title II application may be considered an oral application for SSI benefits and the date of the Title II application may be used to establish the SSI filing date.[30] Pursuant to 20 C.F.R. §416.350(b):

> If the person applying for title II benefits does not file an application for SSI on a prescribed form when SSI is explained to him or her, we will treat his or her filing of an application for title II benefits as an oral inquiry about SSI, and the date of the title II application form may be used to establish the SSI application date if the requirements of §416.345(d) and (e) are met.

Section 416.345 requires *inter alia* that the claimant file an application on a prescribed form "within 60 days after the date of the notice we will send telling of the need to file an application."[31] Because the ALJ incorrectly stated the law, he failed to make any findings as to whether the requirements of §416.345 had been met. On remand, the ALJ should reconsider Plaintiff's petition to amend her claim

---

[29] Defendant acknowledges that the "Title II application can establish a protective filing date -- if other requirements are met." Doc. 17, page 11 n.6.

[30] See 20 C.F.R. §416.350.

[31] Defendant argues that the date of the Title II filing is not Plaintiff's protective filing date because Plaintiff was "presumably" told about the SSI requirements when she filed her Title II application and "apparently" she did not file a SSI application within 60 days. See Doc. 17, page 11.

to include an application for Supplemental Security Income, and should make findings consistent with 20 C.F.R. §§416.350 and 416.345. [32]

## V. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the Administrative Law Judge to: (1) reconsider the medical evidence post-dating May 11, 1999 and determine its relevance, if any, to whether Plaintiff was disabled as of December 31, 1998; (2) reconsider Plaintiff's petition to amend her claim to include an application for Supplemental Security Income, making findings consistent with 20 C.F.R. §§416.350 and 416.345; and (3) to conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on February 3, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel

---

[32] The Court is expressing no opinion as to whether Plaintiff's Title II application established a protective filing date or whether Plaintiff should be permitted to amend her claim to include an application for Supplemental Security Income Benefits.